(69 Misc. Rep. 1.)

PEOPLE ex rel. HUDSON & M. R. CO. v. STATE BOARD OF TAX COM'RS
(CITY OF NEW YORK, Intervener).

(Supreme Court, Trial Term, Albany County. September, 1910.)

1. TAXATION (§ 496*)—ASSESSMENT OF SPECIAL FRANCHISES—REVIEW BY CERTIORARI—REVALUATION.

On certiorari by a railroad company to review an assessment by the State Board of Tax Commissioners of special franchises, where commissioners make return that they had information other than relator's evidence and exhibits in forming their opinion, but fail to return such other evidence for the court's consideration, and do not disclose the modus operandi which led to their result, nor comply with the writ, the court may revalue the franchises.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 905, 908; Dec. Dig. § 496.*]

2. TAXATION (§ 496*)—ASSESSMENT OF SPECIAL FRANCHISES—RIGHT TO QUESTION—ESTOPPEL.

A claim by a railroad company before the State Board of Tax Commissioners that its tangibles and intangibles comprising special franchises were not assessable because nonearning, and that the cost of its tunnels was less than the commissioners' valuation, does not preclude the railroad company from questioning the amount of the assessment made by the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

commissioners on certiorari where proof upon which both tangibles and intangibles could be valued separately and in the aggregate was offered both to the commissioners and to the court, and it appears that the aggregate is less than the assessment made by the commissioners.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 895; Dec. Dig. § 496.*]

3. TAXATION (§ 376*)—SPECIAL FRANCHISES—EASEMENT OF RIGHT OF WAY.

A patent by the state to a railroad company of a right of way, 160 feet wide and 40 feet high, under the Hudson river, for the construction of tunnels for operation of the railroad underneath the river, is a grant merely of an easement to use the land for railroad purposes and not a grant of the fee, and is taxable as intangible property constituting a special franchise.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 630, 632; Dec. Dig. § 376.*]

4. COMMERCE (§ 73*)—SPECIAL FRANCHISES—USE IN PART IN INTERSTATE COMMERCE.

The franchise being largely used for local traffic within the state could be taxed by the state, though used partly in interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 124–134; Dec. Dig. § 73.*]

5. TAXATION (§ 144*)—SPECIAL FRANCHISES.

The franchise is not nonassessable for taxation because the tunnels have not been completed, and the company has no present net earnings therefrom.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 250; Dec. Dig. § 144.*]

6. TAXATION (§ 390*)—RAILROAD PROPERTY NOT PRODUCING AN INCOME.

The actual value of railroad property not producing an income and not the cost of reproduction is the true basis for taxation thereof.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 653; Dec. Dig. § 390.*]

7. TAXATION (§ 376*)—SPECIAL RAILROAD FRANCHISES—VALUATION OF TANGIBLE AND INTANGIBLE PROPERTY.

Where net earnings of special railroad franchises after deducting a reasonable return upon tangibles discloses the value of the intangible property, an estimate of prospective gross earnings of all the property involved fairly made by the owner of the franchise and the city in which it is located may be used as a basis for valuation of both the tangible and intangible property.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

8. TAXATION (§ 376*)—SPECIAL RAILROAD FRANCHISES—VALUATION.

Where a tunnel enterprise of a railroad company holding a special franchise from a city is not a failure nor reasonably likely to be so, in valuing the franchise tangible and intangible property involved may be together estimated on the basis of prospective earning power by taking a share of the net earnings of the entire line projected within the district covered by the franchise, proportioned to the relative length of the tunnel completed, and capitalizing it at 6 per cent.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

9. EVIDENCE (§ 5*)—JUDICIAL NOTICE—AMOUNT OF TRAFFIC THROUGH HUDSON RIVER TUNNEL.

On certiorari to review an assessment of a special franchise of a right of way for a tunnel under the Hudson river from New York City to New Jersey, the court will take judicial notice of the size and extent of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

city of New York, the importance of unobstructed access to it from New Jersey at all seasons of the year, and of the great amount of traffic between the city of New York and New Jersey.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 4; Dec. Dig. § 5.*]

10. TAXATION (§ 496*)—SPECIAL FRANCHISES—TUNNELS IN CITY STREETS—VALUATION.
Where the entire amount of rental fixed by the board of rapid transit commissioners of the city of New York upon sale of franchises in the city streets for tunnel purposes is clearly set out in the record on certiorari to review an assessment of such a franchise, a basis for assessment of intangible rights connected therewith may be found by capitalizing the annual rental fixed by the board.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 905–908; Dec. Dig. § 496.*]

11. TAXATION (§ 376*)—SPECIAL FRANCHISES—BASIS FOR ASSESSMENT.
The value of intangible rights in streets for tunnel purposes based upon a theory of depreciation of the value of center lots in blocks adjoining such tunnel streets because of the use thereunder of similar tunnels may be a basis for assessment of such intangible rights, and the value of the tangible property connected with the special franchise may be ascertained by deducting from the aggregate value of tangibles and intangibles the value of the intangible rights so ascertained.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 629–631; Dec. Dig. § 376.*]

12. TAXATION (§ 317*)—SPECIAL RAILROAD FRANCHISE—EFFECT OF ASSESSMENT BY LOCAL ASSESSORS.
Local assessors having no authority to assess tangible property constituting part of a special railroad franchise assessed by the State Board of Tax Commissioners, their action in doing so does not constitute double assessment preventing an assessment by state officers of the property as a franchise, but is without jurisdiction, and may be declared void in a proper proceeding.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 525, 526; Dec. Dig. § 317.*]

13. TAXATION (§ 496*)—ASSESSMENT OF SPECIAL RAILROAD FRANCHISE—REVIEW BY CERTIORARI.
The right of the owner of a special railroad franchise upon certiorari to review its assessment by the State Board of Tax Commissioners is not impaired by failure to object before the state board that the assessment was unequal because the local assessors in the same district had assessed realty at a fraction only of its value; the state board having no power to consider such an objection.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 892; Dec. Dig. § 496.*]

14. TAXATION (§ 496*)—ASSESSMENT—SPECIAL RAILROAD FRANCHISES—REVIEW BY CERTIORARI.
The owner's right to object on certiorari that its assessment was unequal in comparison with the assessment of other special franchises in the same district was not affected by its failure to urge such objection before the state board, where it appears that the owner when filing its protest with the Board of Tax Commissioners could not claim inequality on such grounds because the board claimed that its tentative assessment roll was a confidential record.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 892; Dec. Dig. § 496.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

15. TAXATION (§ 496*)—ASSESSMENT—REVIEW BY CERTIORARI—COSTS.

Tax Law (Consol. Laws. c. 60) § 294, provides that if the writ of certiorari to review an assessment be quashed or the assessment confirmed, or if the assessment be reduced by an amount less than half the reduction claimed before the assessing officers, costs and disbursements shall be awarded against petitioner. *Held*, that where the owner of a special franchise claims before the assessing officers that the assessment should be annulled, and that no assessment whatever should be made, and, on certiorari to review the assessment made, the amount of the reduction was less than half the total amount of the assessment, costs and disbursements will be awarded against petitioner.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 910; Dec. Dig. § 496.*]

Certiorari by the People, on the relation of the Hudson & Manhattan Railroad Company, to review an assessment of the relator's special franchises in the city of New York made by the State Board of Tax Commissioners, in which the city of New York intervenes. Assessment reduced.

Trial upon return to writ of certiorari heretofore issued herein to review the assessment of relator's special franchises in the city of New York for the year 1908 made by the State Board of Tax Commissioners. The relator is a consolidated company, resulting from the consolidation of New York & Jersey Railroad Company, Hoboken & Manhattan Railroad Company, and Hudson & Manhattan Railroad Company, which consolidation was effected in December, 1906. In 1891 the state, by patent, granted to the Hudson Tunnel Railway Company, its successors and assigns, "a right of way 160 feet in width and 40 feet in height within which to construct four tunnels for the use and operation of the railway of said company beneath the waters of the Hudson river, upon and along the route of said railway between the city of New York in the state of New York and the city of Jersey City in the state of New Jersey." This tunnel was but partially bored when all the rights of the tunnel company were acquired by the New York & Jersey Railroad Company.

On July 2, 1902, the board of rapid transit commissioners for the city of New York granted to New York & Jersey Railroad Company the right to construct and operate a railway, including two tracks, on the route beginning at the boundary line between the states of New York and New Jersey under the Hudson river, substantially opposite the foot of Morton street; thence running under the river, piers upon the shore thereof, and under various public streets of the city of New York, to a terminal in the city of New York in the westerly half of the block bounded by Christopher, West Tenth, and Hudson streets. By like certificate, dated February 2, 1905, the same commissioners authorized this company to extend its railway, beginning at the terminus-previously authorized; thence under Christopher street to Sixth avenue; thence with one branch under Sixth avenue to the terminal at or near Sixth avenue and Thirty-Third street, with another branch diagonally crossing under Sixth avenue to Ninth street; thence easterly under Ninth street to terminal station at the intersection of Fourth avenue and Ninth street, to connect with the city subway at that point. The compensation to be annually paid to the city by the agreements set up in the relator's report, filed with the State Tax Commission, was stated to be about $33,050 for these franchises.

November 24, 1903, the same commissioners granted a franchise to Hudson & Manhattan Railroad Company to construct and operate a railway on a route beginning on the boundary line between the states of New York and New Jersey under the Hudson river, at a point nearly opposite the foot of Cortlandt street in the borough of Manhattan; thence under the river and dock property, under various public streets, and under private property to a point in Cortlandt street near Church street; thence under private property and under Dey street, and through public streets westwardly to West street, and again under the dock or bulkhead property to the east bank of the Hudson;

still westwardly under the Hudson river to a point in the boundary line between the states of New York and New Jersey, nearly opposite the foot of Fulton street. The annual compensation for all franchises to be paid the city exceeded $48,000.

All these franchises were granted in perpetuity, but periods of 25 years were set for modification of the various terms of compensation, and stringent limitations on their exercise were made by the city. Each franchise assumed that the earnings of the property covered by the franchise granted would amount to a gross of $300,000 annually, making a total gross of $900,000 as the estimated earnings of the tunnels in New York. Each certificate assumed power on the part of the city to grant a franchise under the waters of the Hudson river to the New Jersey line. In the year 1907 the franchise of 1905 was modified by consent of both parties, but no change whatever as late as 1907 was made in the estimated gross earnings of the railroad company.

On June 26, 1907, the board of estimate and apportionment authorized the relator to construct, maintain, and use an overhead bridge over and across Dey street between Church and Greenwich streets, to connect the buildings owned by the company on both sides of Dey street. On December 31, 1907, the relator had a planned tunnel system within the states of New York and New Jersey of $25^1/_{10}$ miles in length. Within the city and state of New York there were projected $9^8/_{10}$ miles of this system. Through traffic from downtown to uptown New York was planned via Jersey City and Hoboken. The larger part of the expenditure upon the tunnels had been and was to be made within the state of New Jersey, because of connections there to be made with the great trunk lines whose terminals were upon the westerly bank of the Hudson river. The twin tunnels built under these franchises were known, respectively, as the "Uptown" and "Downtown" tunnels. The downtown tunnels were in no sense completed. The uptown tunnels were in part completed, but not yet ready for operation. The percentage of tunnel constructed within the state was $4^4/_{10}$ miles. No earnings had been obtained by the tunnel company on this date. The first operation of the uptown tunnels for hire was in February, 1908, and not within the taxable year. The local assessors assessed all of the tangibles of relator for the year 1907, covered by these franchises, at $2,525,000. The special franchises of relator for the year 1908 were in 1908 assessed by the State Tax Commissioners, tentatively, at $6,900,000. The relator duly filed a protest, which protest was overruled, and final assessment was made by the State Tax Commissioners at the same amount. Relator sued out a writ of certiorari in this court. Upon return thereto Mr. Lewis E. Carr, Jr., was appointed referee to take testimony. This testimony, with relator's proofs filed before the commission, was submitted finally to this court at a Special Term held in Albany county.

Stetson, Jennings & Russell (Lewis E. Carr and F. B. Jennings, of counsel), for relator.

Edward R. O'Malley, Atty. Gen. (Lewis Cass, special counsel), for State Board of Tax Com'rs.

Archibald R. Wátson, Corp. Counsel (Curtis A. Peters, Asst. Corp. Counsel, of counsel), for city of New York.

LE BOEUF, J. This case is submitted under peculiar conditions. Relator claimed its special franchises nonassessable, or, if assessable at all, only to be valued on the basis of the junk value of its physical property in the tunnels, to wit, $45,000. The respondents attempt to sustain an assessment of $6,900,000, made on tangibles alone, and upon an erroneous theory, with a technical motion to quash the writ. This mainly based upon the fact that before the state board relator claimed its special franchises not assessable. It appears from the record accompanying the return that the evidence upon which the State Board of Tax Commissioners made the assessment in question, so far

as the relator was concerned, was the report of the relator itself, with certain additional affidavits required by the commissioners to supplement the report, certificates of the franchises of the relator, and references to a previous report with exhibits placed on file for the assessment made in the previous year. These affidavits set up that the tunnels were incomplete and in the hands of contractors, but that their cost, coupled with large amounts expended for shoring other properties, which added nothing to the tunnels proper, and a large amount of general office and power expenses, amounted to the sum of $5,358,-350.84. Deducting these other expenses claimed to be no part of the actual cost of reproduction, the cost of the tunnels was claimed not to exceed $3,773,268.17. The length of the tunnel within the city and state of New York, the total mileage length of the whole tunnel system, and the amount of work done, were especially set up. Reference was made to the franchises received from the city, and the fact that annual compensation was required to be paid therefor. The protest of the relator to the tentative assessment was overruled, though no new information was required, and the assessment was finally fixed at $6,-900,000.

When we turn to the return to the writ of certiorari, we find that the relator's evidence and exhibits are set up as having been considered, and then it is alleged that other information was obtained "opinion" formed from inquiry by the agents of the commissioners. This evidence was not returned, however, for the court's consideration. The return states practically the same additional grounds condemned in People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N. Y. 39, 89 N. E. 581. No modus operandi was given, and the return did not comply with the demand of the writ. People ex rel. Buffalo Gas Co. v. State Board of Tax Com'rs, 199 N. Y. 162, 92 N. E. 215; People ex rel. Lehigh Valley R. Co, v. State Board of Tax Com'rs, 199 N. Y. 167, 92 N. E. 217. Under these decisions this court was justified in proceeding upon such a return to a revaluation of the franchises.

Upon the coming in of the testimony taken before the referee, that testimony and the relator's original record were submitted to me at Special Term.. At that hearing the opinion evidence before the commissioners set up in their return was first disclosed. It consisted simply of an estimate of the cost of reproduction of the relator's tangibles alone. This was made by the commission's engineer, Mr. Rumrey, unfortunately under difficulties, at a time when the entire downtown tunnels and a portion of the uptown tunnels were under air pressure, and open only to workmen, or those in charge of the work. This estimate was nowhere claimed to have been the result of a personal examination of the property. The tentative assessment roll, which at first the commissioners refused to produce, upon the ground that it was a confidential record, was finally put in evidence by the relator. This bore out Mr. Rumrey's statement that he had furnished this estimate to the commissioners for the purpose of making the assessment. Relator's tangibles were there valued at $6,921,000. The intangibles were not separately stated. The commissioners struck out $21,000 for round

numbers and made the assessment $6,900,000 without any valuation of intangibles. The proof disclosed that this was the method of making the assessment, but the city concedes it in its brief, saying:

"We have discussed this proposition as if the commissioners had placed a value upon the intangible rights owned by the relator. As a matter of fact, as appears from the testimony of Mr. Rumrey, one of the engineers of the State Board, the assessment is some $21,000 less than the actual value of the tangible property. The relator, therefore, far from being injured in this case by the assessment, has actually escaped all taxation for 1908 upon the value of its intangible special franchises."

The commissioners having failed to assess the relator's intangibles, and having assessed its tangibles upon what I deem an erroneous rule, I find on the record submitted that the total assessment exceeded any fair aggregate valuation of both elements composing the special franchises.

The relator claimed before the commissioners that its tangibles and intangibles were not lawfully assessable, because nonearning, and that the cost of its tunnels was much less than the value found by the commissioners. The city now claims that, because of this contention, the relator is concluded from questioning any assessment which the commissioners have made, though it be now shown to be plainly erroneous. While this court disallows the claim that the rights were valueless, it will not penalize the relator for making that claim, when proof was offered the commissioners and the court upon which both tangibles and intangibles could be separately valued; the aggregate of such valuation being found less than the commissioners' assessment. The enforcement of the tax law (Consol. Laws, c. 60) through the courts is not the playing of a game for points, but an honest effort on the part of the state to secure to taxing districts a fair valuation upon the special rights conferred upon public service corporations. In securing this result, it has been held that these proceedings are in the nature of a revaluation of the property. The intent of the law would not be worked out, if a palpably erroneous assessment could not be reviewed and reassessed because the relator had a different view of the law as to the taxability of its franchises. The petition set up sufficient grounds for such a review. Upon the record before the commissioners, and with the additional testimony taken in this proceeding, it is found that the relator has sustained the burden of proving that the assessment made by the commissioners was both erroneous and excessive.

Under these circumstances, all the motions made by the city of New York and the State Board of Tax Commissioners to quash the writ are denied, with an exception. The jurisdictional objections raised by the relator must as well be overruled.

It is claimed that a portion of the uptown tunnels were built under a patent obtained from the state of New York upon land granted to it in fee. It appears from this patent that no fee was granted the Hudson Tunnel Railway Company. What was granted was "a right of way," for a specific purpose, the construction of tunnels therein "for the use and operation of the railway of said company beneath the waters of the Hudson river." Assuming the fee to have been in the grantor at the time of the grant, it was proper that an interest in realty

being given, it should be given in the form of a grant. The relator can hardly claim any other right to the use of the property than that of constructing a railway thereover. Such a right would appear to be merely an easement and inconsistent with the grant of a fee. As such an easement under a public water, it seems to fully come within a right made taxable as a special franchise, by the provisions of the tax law.

The second claim to exemption is that the relator is engaged almost exclusively in interstate commerce, that the tax upon its special franchises is one upon its business or earnings, and that no tax can be levied except upon its tangible property. In People ex rel. Pennsylvania R. Co. v. Wemple, 138 N. Y. 1, 11, 33 N. E. 720, 723, 19 L. R. A. 694, the Court of Appeals, said, speaking of federal decisions:

"The courts have given the broadest construction to the power of a state to lay a property tax on property employed in interstate commerce, provided * * * it is subjected to no unjust discrimination."

This special franchise is made realty by the terms of the statute. The special franchise consists not only of the intangible franchise itself, but of actual property used in connection therewith. It is property which is not by statute to be valued exclusively by its earnings, though that in a proper case may be a satisfactory test. The tax is not a distinct tax upon earnings separate from the property which really produces those earnings, but one upon that tangible property plus the intangible rights which give the tangible value. It is too much to say that this combination of tangible property with an intangible franchise constitutes no property within the meaning of this decision, and there is no claim of unjust discrimination made in this case.

Apart entirely from such a view, however, the case last cited shows that the courts of this state will not uphold such a claim as here made, except the corporation whose earnings were taxed was exclusively engaged in interstate commerce. The relator's plans themselves show that a large part of its structures are constructed under the streets of the city of New York, with stations permitting local traffic entirely within the city and state, and through traffic from down town New York via New Jersey to uptown New York. It is not even claimed that it is exclusively engaged in interstate commerce, and this local traffic may in time add largely to its revenues. For this reason alone relator's contention upon this proposition cannot be upheld.

The contention that, because the tunnels were not complete and earning, the relator's special franchises are not assessable, must also be overruled. Neither the statute nor the decisions absolutely require net earnings in order that special franchises may be assessed. In the Jamaica Water Supply Company Case it was pointed out that there might be cases where railroads would make no net earnings, because of improper management, and some other rule than net earnings must be applied to value the intangible franchises. If such a condition of affairs can exist in the case of a completed railroad run at a loss, it may in a proper case exist in the case of a railroad whose earning power has not yet been demonstrated. Earnings prospective may fairly be considered in valuing tangibles, where it is apparent that

the enterprise is not a failure, nor reasonably likely so to be. Earnings prospective enter into the market price of property which has not yet demonstrated those earnings. In this case no suggestion is made, regardless of the experience of 1908, that the enterprise is a failure. Indeed, Mr. Eckhardt's testimony showed value in the tunnel rights alone under the city streets of over $1,000,000. The relator cites the opinion of Judge Vann in People ex rel. Metropolitan Street R. Co. v. State Board of Tax Com'rs, 174 N. Y. 443, 67 N. E. 69, 75, 63 L. R. A. 884, 105 Am. St. Rep. 674, where he says:

"The franchise is the right to put something in the highway and use it there, and, if the right fails, the title to what was thus placed goes with the general title."

But in this case the right has not failed, nor is there any question of the severance of the property from the right. Nothing is shown in the record which suggests any such condition of affairs.

It is then suggested that, until the road is completed and used, the franchise can have no value. This seems to be entirely inconsistent with Mr. Eckhardt's testimony that the tunnel rights alone had a value. The court cannot close its eyes to this testimony, nor to the position which the relator itself has taken in bargaining with the city of New York, and assume that these franchises are absolutely valueless. The relator, through its constituent companies, agreed to pay over $48,000 for 25 years for these franchises. In fixing that compensation, a board, whose sole duty it was to consider rapid transit in the city of New York, placed its estimate upon the earning power of the whole scheme within the city of New York. This was done for the purpose of fixing the annual compensation to be paid. That gross earning power was figured at $900,000 per year for the period of 25 years. Though the tunnels had not been completed, there is nothing in the evidence to indicate that any practical difficulty lay in the way of finishing the uncompleted portions in the year 1907. This estimate was not changed in the franchise dealings of 1907 between the same parties.

Under these circumstances, the argument that the franchises were absolutely valueless appears to me to be untenable. The position of the relator that in any event the tangible property only had a junk value for the same reasons appears equally untenable. As pointed out hereafter, a basis existed at that time, apart from Mr. Eckhardt's theory, for valuing both tangible and intangible rights.

These jurisdictional questions disposed of, the respondents insist that the relator has no cause for complaint, because it has escaped taxation upon intangibles, and that the rule applied, cost of reproduction, was the proper rule for fixing the value of this tangible property. They relied for their sole authority upon People ex rel. Delaware, Lackawanna & Western R. R. Co. v. Clapp, 152 N. Y. 490–494, 46 N. E. 842, 843, 39 L. R. A. 237. In that case it was said as to a paying railroad:

"It may not in every case be worth what it would cost to reproduce it. That would depend upon the income or earning capacity of the road after it is built. But this is the case of a paying railroad, and, when valued at what it

would cost to procure the land, construct the roadbed, put down the ties and rails and erect the buildings and other structures all new, it is difficult to see any ground for assessing it at a larger sum."

In this, the case of an uncompleted and nonearning railroad, it is difficult to see any ground for assessing the tangible property at as great a sum. The Clapp Case had only been construed to apply to the case of a paying railroad, and then to state an upset amount beyond which tangible railroad property should not be assessed.

In the Jamaica Water Supply Company Case, in the Appellate Division, 128 App. Div. 13, 112 N. Y. Supp. 392, the court said:

"In determining the value of the tangible property, the cost of reproducing was considered by the Commission and the referee as the proper basis; but it is difficult to understand upon what ground they refuse to give to the relator the actual value of its real estate. The term 'increment of value' to be used as a sinking fund has no place in the assessment of a special franchise. The question is: What is the relator's property, tangible and intangible, actually worth? Actual value and not cost is the true basis for taxation."

Here was a case, apparently, where the rule in the Clapp Case was not applicable, but where very practical reasons existed why cost should not be the test. In this cost over $300,000 had been expended for shoring other properties. This shoring added nothing to the tunnels themselves. The unusual character of the work done under air pressure in large part called for increased cost over a surface railroad. Much of this temporary construction, absolutely necessary to building, was of no use when the air pressure was removed, but it entered largely into cost.

The commissioners did not attempt to apply any other rule whatsoever. It appeared from the proof that the so-called stock and bond rule was not applicable. The very character of the property precluded a market value, as in the case of ordinary lands and structures. Comparison with other property, for the same reason, was not a means of fixing value; but the rule suggested was one which was open to the commissioners, and it might have been followed. Applying this test to the facts, it appeared that the total amount of such value was less than that fixed by the commissioners, and the assessment was not only erroneous but excessive, and, upon other grounds hereinafter discussed, unequal. A reassessment of the property under the tax law might have been ordered to be made by the tax commissioners. The question of inequality, however, could not be considered by the tax commissioners.

The Appellate Division, in the Jamaica Water Supply Company Case, directed the State Board of Tax Commissioners to reassess the property. It is noteworthy that the Court of Appeals modified this order in that respect and directed the Special Term to modify the assessment in accordance with the views expressed by that court. While this was not in terms saying, except in the case of inequality, that a reassessment should not be made by the State Board of Tax Commissioners, no case has been brought to my attention where such a reassessment has been ordered and practically carried out. In fact, the machinery of the statute, apart from the question of inequality, appears to be defective in not providing a practical means for the reassessment of

the special franchises of this relator by the tax commissioners. This proceeding under all the decisions being a reassessment or revaluation of the property, I notified the parties of my conclusion that the assessment was erroneous, excessive, and unequal, and that I would receive additional testimony and proceed to a reassessment upon the existing record and such testimony as might be submitted. Neither party availed itself of this permission. I have therefore proceeded to a revaluation of the special franchises of the relator upon the whole record, consisting of the proof before the commissioners and the testimony subsequently taken herein.

The cost of reproduction in dispute between the parties was in this case not a controlling test. Whether the cost be taken on Mr. Rumrey's estimate or the relator's, the fair value of the tangible property is to my mind much less than the cost of reproduction. A basis for valuation, however, could be found in the determination of the board of rapid transit commissioners in the years 1902, 1903, and 1905, as to the earning capacity of this property, not modified in the dealings of 1907. In that year, the year of this assessment, the terms were otherwise modified. Here the parties, amply competent and equipped to form an estimate of the whole scheme, were fixing the purchase price which should be paid for the franchises. That annual compensation for the first 10 years of the 25-year period can be figured as amounting to more than $48,000, to which other unproven items for vault and terminal space would be added. The $48,000 is made up of charges per linear foot of single tube, separate charges for stations and peculiar terminal rights, and a percentage upon gross receipts. That percentage upon gross receipts was evidently in line with the legislative policy found in Railroad Law (Laws 1890, c. 565) § 95, and in other statutes, requiring such a corporation to pay a percentage of 3 per cent. for the first five years and 5 per cent. thereafter upon its gross receipts for similar privileges. The legislative policy so disclosed was to levy a toll upon all of the earnings of a railroad without attempting to differentiate between the earnings of tangible and intangible property.

The rapid transit act (Laws 1909, c. 498), with its many amendments, created a board of most unusual powers. It may be doubted whether any other body was better constituted to form a judgment of the value of these tunnels. It was that board's solemn duty to see to it that full compensation should be paid to the city for these valuable rights. When, instead of requiring a percentage upon gross receipts without fixing the amount, the board undertook for a period of 25 years to fix the gross earnings of the property and franchises of this relator, it was undertaking a serious responsibility. In order to perform its duty, the board had to take into consideration every element which would tend to show the earning capacity of these tunnels within the state of New York. It is not for a moment to be assumed that this board failed to do its whole duty. Indeed, this board was so well known that this court might almost take judicial notice of the character of the men who composed it. In 1907, when a modification of the compensation was made, an opportunity existed for changing

the estimate which had previously been made. It is noteworthy that the relator then stood before the board, a consolidated company, and no change was made in the original estimates. The position of the state here is different than in the usual case where the franchises to be assessed lie in different taxing districts in the state. The city is a party to this proceeding. The relator and the city are the parties really interested in this assessment, and they were the parties who agreed upon this basis from which the value of the whole enterprise can be figured. If net earnings, after deducting therefrom a reasonable return upon tangibles, will disclose the value of intangible property, an estimate of gross earnings thus fairly made may be employed to value both the tangible and intangible property involved.

The fact that in the actual experience of 1908 net earnings were not realized does not necessarily prove that this was an erroneous rule. Mr. McAdoo had estimated $3,850,000 gross returns for the whole tunnel system in New York and New Jersey. It nowhere appeared how far the system had been completed and was being operated in 1908 in New Jersey. A most important factor, the downtown tunnels and the subway connections at Fourth avenue, was not operating in 1908. The gross earnings were nearly $530,000. A small part was in operation from February and an increased portion from August. Without explanation in the record, it may well be that this was a fair showing under all the circumstances and consistent with the estimate made by the relator and the rapid transit commissioners. The court is bound to take judicial notice of the size and extent of the city of New York, and the importance of unobstructed access to it from New Jersey at all seasons of the year, and of the great amount of traffic between the city of New York and New Jersey. It was estimated that 40 per cent. of the gross receipts would pay the operating expenses and taxes of the tunnels. The experience of 1908 may perhaps cause the relator to doubt whether this figure was not low. It is less than the usual estimate of 65 to 70 per cent. for suburban railroads. The traffic conditions are different, however, than in these cases. Moreover, this percentage is the only available figure in the record. No proof was offered of the character of the operation during that period, and an error now as to this percentage cannot be assumed. Very satisfactory proof of the reason for a lack of net earnings in the year 1908 would, under the supposed case referred to in the Jamaica Water Supply Company Case, have to be given in order to make the lack of net earnings an important factor in determining the assessment.

The relator's tunnels in New York, when completed, were to be $9^8/_{10}$ miles in length. This was a structure which was figured to produce $900,000 gross earnings. Four and four-tenths miles were the equivalent of completed structures at the time of the making of the assessment. Taking the proportionate part which this bore to the whole enterprise, the gross earnings of the completed portion would have been estimated to be $404,081.61. Sixty per cent. of this, or $242,448.96, would be the net, after deducting operating expenses and taxes, but not deducting the return upon tangible property. Capitaliz-

ing this sum at 6 per cent., the resulting $4,040,816.12 would represent, on a basis of 6 per cent., a fair valuation of the tangible and intangible property, based upon the earning power of the whole enterprise. This will doubtless include rolling stock; but, as no figures for deduction are given, the disadvantage must be the relator's. This estimate does not include any figures upon the Dey Street bridge. Its part in railroad revenue production is not shown. Upon re-examination of the record, I find that the city's consent to the maintenance of this structure did not, however, become operative in the taxable year for which relator's special franchises are assessed. Two bases were open for the valuation of the intangible rights alone. Over $48,000 per year could be figured from the various exhibits and certificates as the annual compensation to be paid to the city for the franchises. Actual figures are lacking in the record, however, in the case of some vault space and portions for which special charges are made. In one case a rate of 4 per cent. on one-quarter of the assessed value of adjoining property is fixed. Vault space was defined as that within 10 feet of the surface in some sections, but the assessed valuations are not given. By use of the plans drawn to scale some idea of the extent of these sections can be obtained; and it is unlikely that the compensation for such space would equal half of the $48,000 capable of being actually figured. This is hardly more than conjecture, and the evidence is insufficient to permit the calculation of any specific sum as representing the real compensation payable.

Mr. Eckhardt, however, testified that the value of the tunnel rights under the city streets would not exceed the value of a similar tunnel at varying depths passing through the center lot of the blocks adjacent to the streets where the tunnels were built. He placed a value upon such rights by deducting from the surface value of such lands a percentage due to the damage to the fee from a perpetual and unrestricted easement at varying depths beneath these lots. Relator discussed these figures as being a liberal estimate "if this tangible property is to be assessed simply as an interest in land." Mr. Eckhardt, however, figured the depreciation to the fee as giving the value of the easement alone, and gave no consideration to tangible property in his estimate. If his estimate is to be considered at all, it must be as fixing a value upon intangible rights, to wit, the several franchises. No evidence in contradiction of his theory was given. It appears uncontradicted that the city sold to the Pennsylvania Railroad Company, for terminal purposes, the fee to certain city streets at a valuation of $8 per square foot. It was suggested that some additional compensation figured in this, but that was not proven. Mr. Eckhardt's surface value of property adjacent to the downtown tunnels largely exceeded the amount given; and, in the case of uptown tunnels, where it was less, it was not contradicted. The city, in figuring vault space, figured 4 per cent. on 25 per cent. of the assessed valuation of adjoining property. This took into consideration evidently interferences with privileges which it might grant to adjoining property owners to maintain vaults. The section of uptown tunnels, going toward Christopher street and Sixth avenue, is far below the level of vault space, because

of the depth necessary to pass under the river. Mr. Eckhardt figures 15 per cent. depreciation of valuation in this section. In every other section 25 per cent. was the depreciation. That is to say, the same percentage as figured for vault space within 10 feet of the surface, except that this was not upon the value of adjoining lands. His figures were apparently upon a perpetual easement in a city lot, taking into consideration interference with caissons, foundations, and vault space. No such condition of affairs, outside of vault space of ten feet, existed in the whole tunnel system of the relator.

In the first place, it was not granted a perpetual easement, displacing every other use. No caissons or structures were likely to be permitted to be sunk in the streets to uphold adjacent property in the vicinity of its tunnels. All other street uses were by the terms of the franchises permitted. The location of the tunnels in part could be changed upon demand of the city. A large part of the tunnel was, indeed, subject to condemnation. It is noteworthy that the price to be paid in such event was to be fixed by appraisal and could not exceed the cost of reproduction, from which it was apparent that it might be less. With these differences, little objection can be raised to the fact that Mr. Eckhardt took center lots as the basis of calculation rather than the adjoining property. He did not undertake to place any value upon the tunnel rights under the river. It is apparent that these could not have exceeded in any event the value of the tunnel rights at a point near where the tunnel entered under the streets from the river. These rights were of no value whatever except as connected with the rights in the city. They interfere in no respect with the traffic upon the river, and the valuation suggested by the relator of these river rights on the same basis as that upon immediately adjoining street tunnel rights may be too high rather than too low, but has been by me adopted.

Taking into consideration the different character of this easement under water, the valuation thus found is so high as to fairly include the rights granted in the state patent. Those were greater than in the case of the other tunnels under water. Upon this basis the value of these intangible rights can be figured at $1,753,244.15. These, deducted from the gross heretofore found, would place a valuation of $2,287,671.97 upon the value of the tangible property. The situation resolves itself as follows: An assessment of $6,900,000 on tangibles alone, but valued on an erroneous basis, has been made by the commissioners. The parties in interest have contracted for the purchase and sale of these franchises, including those under the Hudson river, upon a basis from which a total value of tangibles and intangibles of $4,040,816.12 could be found. If relator, though solvent, had found itself unable to complete its system and had offered its property for sale at the time of the making of the assessment, such a basis of fixing value would fairly have been considered by intending purchasers. No basis exists for fixing the value in excess of this amount; and on all the evidence in the case it appears that this, despite the fact that the tunnels were not completed, is a fair value to be placed upon the entire special franchises. Evidence has been given,

outside of this contract, from which a fair valuation can be placed upon the intangible property. I, therefore, revalue the relator's special franchise at the total sum of $4,040,816.12, and value separately the intangible property at $1,753,244.15, and the tangible property used in connection therewith at $2,287,671.97. The local assessors of the city of New York placed an assessment for the same year on this tangible property, it is noteworthy, of $2,525,000. The claim that this makes a double assessment, and for that reason no special franchise assessment can be made, is untenable. The local assessors under the tax law made this assessment without jurisdiction, and relator has its appropriate remedy to have their act declared void.

The motion to dismiss the writ, upon the ground that the question of inequality raised in the petition was not presented as an objection to the State Board of Tax Commissioners, is denied with an exception. The claimed inequality was upon two grounds: First. That the assessment was unequal, in that the assessors of the city of New York valued other real estate at 89 per cent. of its full value, whereas the commissioners had undertaken to make the assessment upon what they claimed was full valuation. It is apparent that, under the rule in the Jamaica Water Supply Company Case, the relator was not called upon to make such an objection to a commission which had no power to act upon it. The second claim of inequality was that relator's assessment was much larger in proportion than the assessment of all other franchises of a similar character in the city of New York assessed that year by the State Board of Tax Commissioners. A fair excuse appeared to me to have been given by the relator for not making that claim before the state board. That board claimed that the tentative assessment roll was a confidential record, and it appeared fairly clear that, neither under the statute nor the theory of the commissioners, was the relator in a position at the time of the filing of its protest to make this claim of inequality. The claimed inequality, upon comparison with the assessment of other similar franchises of the city of New York, seemed to be fairly made out, and one which, even under the authorities cited by the respondent, should be considered by this court. While the inequality upon undisputed proof plainly existed, a basis for reduction upon this ground cannot be worked out on the evidence submitted. I am unable to make any reduction of the assessment upon this ground, as the exact proportion of that inequality cannot be ascertained. Upon the ground of general inequality, the evidence herein was of the same character as has been received with the approval of the appellate courts in other cases.

It appeared that other real estate in New York City was locally assessed at 89 per cent. of its full valuation. Relator is therefore entitled to a reduction of 11 per cent. from the gross value of its special franchises as heretofore found, and the special franchise assessment complained of is directed to be reduced to the sum of $3,596,326.35. Though the relator has been substantially successful, it does not appear to be entitled to costs under the peculiar provisions of the tax law. Section 294 of that law provides:

"If the writ shall be quashed or the assessment confirmed, or if the assessment complained of shall be reduced by an amount less than half the reduction

claimed before the assessing officers, costs and disbursements shall be awarded against the petitioner."

Before the assessing officers the relator claimed that the assessment should be annulled, and that no assessment whatever should be made upon its special franchises. As the amount of the reduction is less than half of the total amount of the assessment, it would seem that costs, including the stipulated disbursements set forth in the record, must be awarded against petitioner, and it is so ordered.

Ordered accordingly.